Aaron T. Martin
Martin Law & Mediation PLLC
PO Box 45023
Phoenix, AZ 85064
State Bar No. 028358
aaron@martinlawandmediation.com
(602) 812-2680

*Attorneys for Plaintiff Sara Laird*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Laird, an individual, | No. 2:21-cv-00211-JJT |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| Arizona State Schools for the Deaf and Blind, an Arizona public corporation; Annette Reichman, a single woman, | **(Jury Trial Requested)** |
| Defendants. | |

Plaintiff Sara Laird ("Ms. Laird"), for her First Amended Complaint, alleges as follows:

### INTRODUCTION

1. Ms. Laird has a Bachelor of Arts in Elementary Education and a Master of Arts in Special Education, Special Education and Rehabilitation, Teacher of the Deaf and/or Hard of Hearing ("TOD"). She has over 10 years of experience teaching in the field of Deaf Education.

2. Defendant Arizona State Schools for the Deaf and Blind ("ASDB") employed Ms. Laird from August 2010 to February 2013 and again from January 2018 until Defendants discharged her from employment and/or did not renew her contract on February 10, 2020.

3. Defendants repeatedly discriminated and retaliated against Ms. Laird, and



unlawfully discharged Ms. Laird from her employment, because, among other things, she: (i) exercised her right to advocate on behalf of her students and their families; (ii) identified that Defendants violated various federal and state laws; and (iii) filed formal grievances with ASDB administrators and the ASDB Board; (iv) communicated with media; (v) attended public board meetings for ASDB, AzEIP, and other agencies and public bodies; and (vi) filed a discrimination and retaliation charge with the Office for Civil Rights of the U.S. Department of Education.

4. Defendants' discrimination, retaliation, and other tortious conduct against Ms. Laird has tarnished Ms. Laird's personal and professional reputation both professionally and with organizations in the teaching and Deaf Education community, and made it impossible for Ms. Laird to work in her chosen profession.

## PARTIES, JURISDICTION, AND VENUE

5. Ms. Laird is a United States citizen who resides in Maricopa County, Arizona.

6. ASDB is an Arizona public corporation under A.R.S. § 15-1303.

7. ASDB is an "employer" engaged in an industry affecting commerce as defined by 42 U.S.C. § 2000e(b).

8. Upon information and belief, Defendant Annette Reichman (i) is a single woman; (ii) resides in Maricopa County, Arizona; and (iii) acted for and on behalf of her own benefit at all times material to this Complaint.

9. The claims in this Complaint arise out of Defendants' acts and omissions that occurred in Maricopa County, Arizona.

10. Defendants caused Ms. Laird to suffer damages in Maricopa County, Arizona.

11. This Court has jurisdiction over these parties and claims under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

# FACTUAL ALLEGATIONS

### *ASDB, Ms. Reichman, and Ms. Benedict*

13. ASDB provides education and related services in Arizona for students who have hearing and/or visual impairment(s).

14. Under A.R.S. § 15-1302(B), ASDB must educate sensory impaired persons so that they may become self-sustaining and useful citizens.

15. Under A.R.S. § 15-1325(B), ASDB must consider the following qualifications for a candidate for the superintendent position: (i) experience in the education of students who are deaf, hard of hearing, blind, visually impaired and deaf and blind; (ii) experience in the administration of education programs for students who are deaf, hard of hearing, blind, visually impaired and deaf and blind; and (iii) a clear understanding of, and expertise in, the education issues facing deaf and blind students, language acquisition, communication access, independent living and accessible education materials.

16. At all times material to this Complaint, Ms. Reichman was and is the Superintendent of ASDB.

17. As of July 2019, Ms. Kendra Benedict was and is ASDB's Statewide Early Learning Program ("ELP") Birth-to-5 Director.

18. Before July 2019, Barbara Schrag was ASDB's Statewide Early Childhood Family Education ("ECFE") Program Director for Birth–3.

19. Upon information and belief, Ms. Reichman does not have a valid teaching certificate from the Arizona State Department of Education.

20. Upon information and belief, Ms. Reichman has never had a valid teaching certificate from the Arizona State Department of Education.

21. Upon information and belief, Ms. Reichman does not have a valid teaching certificate to teach students who are deaf, hard of hearing, blind, visually impaired, or deaf and blind.

22. Upon information and belief, Ms. Reichman has never had a valid teaching certificate to teach students who are deaf, hard of hearing, blind, visually impaired, or deaf

and blind.

23. Under ASDB's policies and procedures, ASDB "act[s] as the general agent of the state of Arizona in carrying out the will of the people of the state in the matter of public education for the deaf and blind."

24. ASDB adopted a policy to "develop procedures that provide educational opportunities for individuals with disabilities and that accomplish ASDB compliance with federal laws including the Individuals with Disabilities Education Act (IDEA), the Arizona Constitution, the Arizona Revised Statutes, and the lawful regulations of the State Board of Education. ASDB shall also comply with federal law included in the Rehabilitation Act of 1873 (Section 504) to the extent applicable to any student."

25. Under A.R.S. § 15-1341(A), ASDB must teach and train its students by methods which are to the students' best interests.

26. Under A.R.S. § 15-1341(B), ASDB must ensure the careful supervision of the care, education and development of pupils to ensure that the best care and education known to modern science is given, as nearly as is practicable, and that the best methods of teaching the sensory impaired are used in the school.

27. Under A.R.S. § 15-1341(C), ASDB must give special attention to the methods of care, education and development of the persons admitted, with particular consideration of the humanitarian aspects of their education.

28. In determining a child's admission to ASDB, under A.R.S. § 15-1342(B), a placement and evaluation team shall determine the appropriate educational placement for a child based on the development of an individualized education program ("IEP").

29. Under A.R.S. § 15-1342(B), the placement and evaluation team must document that it has advised the parent or legal guardian of all placement options.

30. Under A.R.S. § 15-1342(B), the placement and evaluation team must consist of at least the following persons: (i) the child's parent or legal guardian; (ii) an administrator from the school district in which the child resides; (iii) a certified teacher of the sensory impaired who provides or may provide in the future educational services to the child; (iv) an



1 evaluator; and (v) a representative of ASDB.

2   31.   Under A.R.S. § 15-1342(C), an individualized planning conference for a student enrolled at ASDB must occur annually, and the conference must include: (i) a representative of the school district in which the child resides; (ii) a representative of ASDB; (iii) the child's teacher; (iv) the parent; and (v) if appropriate, the child.

### *Ms. Laird Advocated on Her Students' Behalf*

32.   Ms. Laird holds a valid teacher certification from the Arizona Department of Education in the area of Standard Professional Hearing Impaired Special Education, Birth–Grade 12.

33.   In 2017, ASDB recruited Ms. Laird to return as an Early Intervention teacher in ASDB's Early Childhood Family Education Birth–3 program.

34.   Ms. Laird's role as a Birth–3 ASDB Hearing Specialist was to provide education and support to families in a child's natural environment, which included the home as well as other situations outside the home, in accord with a family's Individualized Family Service Plan.

35.   Ms. Laird also assisted and participated in the transition process from IDEA Part C services to IDEA Part B services when a child turned 2 years 6 months old. Children assigned to Ms. Laird's caseload resided in her home school district.

36.   Ms. Laird became an integral and active part of the professional community for the families with whom she worked while at ASDB.

37.   The parents with whom Ms. Laird worked at ASDB specifically and directly asked Ms. Laird to help them navigate the process and actively participate in their children's transition process from IDEA Part C services to IDEA Part B services.

38.   This transition from Part C to Part B services is required for children with diagnosed disabilities so that they may access a free, appropriate public education ("FAPE") in their Local Education Agency ("LEA") (i.e., their local school district or charter school).

39.   Some teachers and other parents they worked with at ASDB also directly contacted Ms. Laird to request her help while meeting with their LEA.



40. At the parents' requests, Ms. Laird attended and participated in multidisciplinary evaluation team meetings and as a member of IEP teams at their LEA.

41. Administrators at ASDB—including Barb Schrag, Laura Hocknull, and Melissa Devries—repeatedly told Ms. Laird that she could not participate in IEP meetings at students' LEAs despite the parents' requests.

42. Ms. Laird was permitted—if not required—to participate in the meetings under A.R.S. § 15-1342.

43. ASDB falsely accused Ms. Laird of violating federal law by participating in IEP meetings at students' LEAs.

44. Defendants later told Ms. Laird that as an AzEIP ASDB provider, she could attend LEA meetings as a guest of the family, but could not participate in the creation of IEP documents.

45. Defendants tried to stop Ms. Laird from attending and participating in the initial IEP meetings because the families realized that ASDB did not provide the services that ASDB promised even though ASDB continued to insist in meetings that they offered certain services that did not exist.

46. ASDB operates the Phoenix Day School for the Deaf in Phoenix, Arizona and the Arizona School for the Deaf in Tucson, Arizona.

47. At all times relevant to the complaint, ASDB offered vastly different services for preschool-aged students at the Phoenix campus compared to the Tucson campus.

48. The disparity of service offerings in Phoenix and Tucson was well known throughout ASDB and by Birth–5 providers.

49. At the Tucson campus, ASDB provides all 3-year-old children who have a diagnosed hearing impairment with a full-time preschool program during the typical school year that includes four days per week for eight hours per day.

50. At the Tucson campus, ASDB provided educational opportunities that support the full continuum of services in regard to communication modality of those who are deaf and/or hard of hearing, including classrooms and qualified providers who offer



1  direct and intensive language instruction in American Sign Language, Dual Language, and Listening and Spoken Language.

51. ASDB offered different programs at the Phoenix campus, including a part-time preschool program during the typical school year that includes four days per week but only three hours per day.

52. At the Phoenix campus, some classrooms have uncertified providers.

53. Some parents of children who attend ASDB have decided their children should not learn American Sign Language, but children enrolled at ASDB's Phoenix preschool campus must learn American Sign Language ("ASL") through services provided by one of ASDB's ASL Specialists on staff regardless of the parents' or IEP Team's decisions.

54. Ms. Laird learned that students at ASDB's Phoenix campus are denied the same educational opportunities that ASDB offers to students who live in other parts of the state, including the opportunities offered at the Tucson campus.

55. Ms. Laird began to advocate within ASDB for those children with whom she worked to access the full range of services that ASDB offered regardless of location and regardless of the child's communication modality.

56. Ms. Laird observed several IEP meetings where Defendants told parents who sought services in a Listening and Spoken Language program that those services existed at ASDB's Phoenix campus even though those services were not available at the Phoenix Day School preschool or K–12 campus.

57. In some cases, ASDB has enrolled students in programs that are the opposite of what their parents and IEP Teams have communicated that they want and the opposite of what has been documented in the students' IEP before and during their placement at ASDB's preschool campuses or other satellite offerings.

58. Ms. Laird was copied on emails where Defendants consistently and continuously misrepresented the nature of ASDB's preschool program to school districts and parents whose children were to be placed at ASDB's Phoenix preschool campus.



59. In at least one instance, ASDB changed the language in a student's IEP after misleading a parent about the nature of its programs and after the IEP meeting concluded.

60. ASDB routinely adds certain language to students' IEPs regardless of the child's particular needs.

***Defendants Discriminated and Retaliated Against Ms. Laird***

61. Defendants targeted Ms. Laird because of her advocacy on behalf of students assigned to her caseload, or whose parents asked her to assist with the IEP process.

62. Defendants sent emails that defamed Ms. Laird within ASDB and to third parties.

63. Defendants gave Ms. Laird a disciplinary warning based on false and defamatory emails.

64. Defendants required Ms. Laird to be supervised and evaluated by someone with the same or less training than Ms. Laird who was not an approved evaluator.

65. After Ms. Laird filed grievances regarding IEPs and two children's transition from Part C to Part B services, Defendants put false and defamatory statements about Ms. Laird in their observation reports and teacher evaluations.

66. Defendants took photographs of Ms. Laird's office, and falsely accused her of not keeping accurate records or preparing lesson planning for her caseload.

67. Defendants attempted to force Ms. Laird to resign from ASDB.

68. Ms. Laird received an intimidating phone call from an ASDB administrator telling her to "separate herself from the agency immediately if she was so dissatisfied with what is happening in IEP meetings with ASDB administration."

69. Defendants denied Ms. Laird the opportunity to be considered for leadership opportunities within ASDB, including but not limited to a leadership work session, mentoring new staff members, graduate student teacher assignments, and the ASDB Language Profile Committee.

70. Defendants excluded Ms. Laird from personal and professional group meetings at ASDB.





71. Defendants did not allow new Birth–3 teachers to shadow or otherwise train with Ms. Laird.

72. An ASDB administrator and other ASDB teachers and staff told Ms. Laird that she would be "blacklisted" for her advocacy for the rest of her career if she was not extremely careful and did not follow Defendants' directions.

73. Defendants reassigned Ms. Laird to the Southern/Tucson B-3 team at ASDB, and required her to accept a caseload that only included students who were geographically distant from her.

74. The Office for Civil Rights of the U.S. Department of Education (OCR) has recognized that "[t]he ability of individuals to oppose discriminatory practices, and to participate in OCR investigations and other proceedings, is critical to ensuring equal educational opportunity in accordance with Federal civil rights laws.  Discriminatory practices are often only raised and remedied when students, parents, teachers, coaches, and others can report such practices to school administrators without the fear of retaliation. Individuals should be commended when they raise concerns about compliance with the Federal civil rights laws, not punished for doing so."  A true and correct copy of the OCR letter dated April 24, 2013 is attached as **Exhibit A**.

75. Defendants discriminated and retaliated against Ms. Laird precisely because she advocated for non-discriminatory practices and compliance with Federal civil rights laws.

76. On September 20, 2019, Ms. Laird filed a complaint with OCR related to Defendants' discrimination and retaliation against her.  A true and correct copy of the OCR complaint is attached as **Exhibit B**.

77. As of November 15, 2019, Ms. Laird had been removed from the Statewide Birth–3 system that collected data and reporting information related to the number of visits, location of visits, and each teacher's monthly totals.

78. On December 30, 2019, Ms. Laird attempted to back-up her own materials located in her "My Drive" folder in ASDB's Google Drive system where she stored her

teaching resources, but she received an email from Google stating that the back-up did not complete.

79. At the end of January 2020, ASDB claimed that Ms. Laird had improperly "hacked" ASDB's computer system and accessed numerous files within the ASDB Google Drive.

80. On January 31, 2020, ASDB put Ms. Laird on administrative leave based on these false "hacking" allegations.

81. On February 6, 2020, ASDB required Ms. Laird to turn in her State property and instructed her to attend a meeting on February 10, 2020.

82. At the meeting on February 10, 2020, Defendants continued to interrogate Ms. Laird and falsely accuse her of "hacking" ASDB's computer system despite Ms. Laird's explanations of what had actually occurred and her repeated offers to cooperate in any investigation.

83. At the meeting on February 10, 2020, ASDB discharged Ms. Laird from her employment and/or did not renew her contract.

84. On May 12, 2020, ASDB had its legal counsel send a letter to Ms. Laird's counsel that falsely accused Ms. Laird of "theft of certain ASDB data." A true and correct copy of the May 12, 2020 letter is attached as **Exhibit C**.

85. ASDB's letter falsely accused Ms. Laird of "deliberately access[ing] approximately 1,000 files on ASDB's Google drive" and "attempt[ing] to cover her tracks."

86. ASDB's letter falsely accused Ms. Laird of "purposefully manipulat[ing] ASDB's data permissions over 2,000 times."

87. ASDB's letter falsely accused Ms. Laird of accessing and stealing "records containing personal information of over 1,500 students and employees."

88. ASDB's letter falsely accused Ms. Laird of accessing and viewing "thousands of files over a 19-hour time span during the Holiday Recess."

89. ASDB's letter falsely accused Ms. Laird of going "to great lengths to attempt to obscure her electronic footprint."



90. ASDB's letter falsely accused Ms. Laird of "purposefully and knowingly access[ing] ASDB's data with the intent to steal sensitive and personal information from students and colleagues."

91. ASDB's letter falsely accused Ms. Laird of breaching her employment contract, violating 18 U.S.C. § 1030, and violating multiple ASDB policies.

92. Defendants knew ASDB's letter was false.

93. ASDB's letter was pretextual and in retaliation for Ms. Laird's advocacy on behalf of her students and their families.

94. ASDB's letter was pretextual and in retaliation for Ms. Laird's filing of the OCR complaint.

95. Defendants discriminated and retaliated against Ms. Laird by reporting her to the Phoenix Police Department in an effort to have Ms. Laird investigated for crimes that Defendants knew she had not committed more than five months after the alleged "hacking" took place.

96. Defendants discriminated and retaliated against Ms. Laird by reporting her to the certification department of the Arizona Department of Education in an effort to have her teaching certification revoked based on allegations that Defendants knew were false.

97. On May 20, 2020, Ms. Laird's counsel responded to ASDB's letter to explain that Ms. Laird had neither stolen ASDB data nor done anything improper. A true and correct copy of the May 20, 2020 letter is attached as **Exhibit D**.

98. The letter from Ms. Laird's counsel explained that ASDB's assumptions were baseless, and demanded that ASDB "revisit its false conclusion."

99. The letter from Ms. Laird's counsel demanded "that ASDB cease all efforts to further harm [Ms. Laird] or her reputation, including pursuing a complaint with the Arizona Department of Education."

100. On May 29, 2020, the Investigative Unit of the Arizona Department of Education sent Ms. Laird a "Notice of Investigation/Surrender Certificate(s)" regarding "immoral or unprofessional conduct" related to Ms. Laird's allegedly accessing and taking



1  "approximately 1,000 files from the Arizona State Schools For the Deaf and Blind Google Drive containing personal information of over 1,500 students and employees."  A true and correct copy of the Notice of Investigation is attached as **Exhibit E**.

101. After reviewing the May 20, 2020 letter from Ms. Laird's counsel, ASDB agreed that Ms. Laird could sign an affidavit that described what had actually happened using language that ASDB and its counsel agreed on and approved.

102. On June 16, 2020, Ms. Reichman sent an email to several individuals at the Arizona Early Intervention Program ("AzEIP") that admitted Ms. Reichman made "an error" in communicating with AzEIP about Ms. Laird and "information that relates to employee confidentiality."  A true and correct copy of the email is attached as **Exhibit F**.

103. Defendants refused to and did not acknowledge that their statements about Ms. Laird were false.

104. Defendants refused to and did not withdraw their false statements about Ms. Laird.

105. Defendants refused to and did not apologize to Ms. Laird.

106. On June 22, 2020, Ms. Laird signed the affidavit that ASDB and its counsel agreed on and approved, which was entirely consistent with what Ms. Laird had previously explained to Defendants in January and February 2020.  A true and correct copy of the affidavit is attached as **Exhibit G**.

107. Defendants did not cease their efforts to retaliate and discriminate against Ms. Laird.

108. Defendants did not cease their efforts to otherwise harm Ms. Laird and her reputation.

109. Defendants did not withdraw their false police report about Ms. Laird.

110. Defendants did not withdraw their false Arizona Department of Education complaint about Ms. Laird.

111. The Arizona Department of Education will retain ASDB's complaint, despite its falsity, and may use it against Ms. Laird if a future complaint is ever filed against her.



112. On June 30, 2020, Ms. Laird filed a companion complaint with the OCR related to Defendants' ongoing discrimination and retaliation. A true and correct copy of the OCR complaint is attached as **Exhibit H**.

113. On July 17, 2020, Ms. Laird's counsel sent a response to the Arizona Department of Education's complaint against Ms. Laird. A true and correct copy of the July 17, 2020 response is attached as **Exhibit I**.

114. On August 5, 2020, under A.R.S. § 12-821.01, Ms. Laird served notices of claim on Defendants. True and correct copies of the notices of claim are attached as **Exhibit J**.

115. On August 7, 2020, Ms. Laird filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) and the Civil Rights Division of the Arizona Attorney General's Office (ACRD) related to Defendants' discrimination and retaliation. A true and correct copy of the charge is attached as **Exhibit K**.

116. On September 24, 2020, the Arizona Department of Education sent Ms. Laird a letter to advise the Investigative Unit had declined to file a complaint against Ms. Laird based on Defendants' false allegations. A true and correct copy of the letter is attached as **Exhibit L**.

117. The Arizona Department of Education investigator advised Ms. Laird that Defendants' allegations were unfounded based on the evidence, and had not even warranted an investigation.

118. Under A.R.S. § 41-1481(D), the ACRD had ninety days to dismiss Ms. Laird's charge, settle the matter, or pursue a civil action.

119. More than ninety days have elapsed since Ms. Laird filed her charge with the EEOC and ACRD.

120. The ACRD has not dismissed Ms. Laird's charge, settled the matter, or pursued a civil action.

121. The OCR dismissed Ms. Laird's complaints after and because she filed a charge with the EEOC.



# Count I

## (Violation of § 504 Anti-Retaliation Provision - ASDB)

122. Ms. Laird incorporates by reference the paragraphs set forth above.

123. ASDB retaliated against Ms. Laird in violation of § 504 of the Rehabilitation Act of 1973 for advocating on behalf of disabled students.

124. Section 504(a) states: "No otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (codifying § 504).

125. Section 504 incorporates the anti-retaliation provision of Title VI of the Civil Rights Act of 1964 by providing that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be *available to any person aggrieved by any act or failure to act* by any recipient of Federal assistance." 29 U.S.C. § 794a(2) (Emphasis added.).

126. The anti-retaliation provision of Title VI of the Civil Rights Act incorporated by § 504 states: "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Section 601 of [the Civil Rights] Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part." 34 C.F.R. § 100.7(e). This regulation applies to all rights secured by the Rehabilitation Act pursuant to 34 C.F.R. § 104.61.

127. The anti-retaliation provision in Title VI of the Civil Rights Act has been incorporated by the Rehabilitation Act so as to extend the Rehabilitation Act's protections to "'any individual' who has been intimidated, threatened, coerced, or discriminated against 'for the purpose of interfering with [protected rights]' under Title VI of the Civil Rights Act or the Rehabilitation Act." *Barker v. Riverside Cnty. Off. Of Educ.*, 584 F.3d 821, 825 (9th Cir. 2009) (citation omitted).

128. Defendants' retaliation against Ms. Laird caused Ms. Laird to suffer substantial damages.

129. Ms. Laird is entitled to recover her reasonable attorneys' fees and costs under all applicable law, including but not limited to 29 U.S.C. § 794.

## **Count II**

### **(Retaliation under the ADA - ASDB)**

130. Ms. Laird incorporates by reference the paragraphs set forth above.

131. Title II of the ADA provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

132. The anti-retaliation provisions of Title II of the ADA states: "(a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part. (b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 28 C.F.R. § 35.134.

133. ASDB violated Title II of the ADA.

134. Ms. Laird opposed ASDB's conduct.

135. ASDB unlawfully retaliated against Ms. Laird.

136. ASDB retaliated against Ms. Laird and subsequently fired her and/or failed to renew her contract because she advocated for disabled students who were receiving inadequate public services that qualify as educational services provided by a public school that are covered under Title II of the ADA. *See* 42 U.S.C. § 12131, *et seq*.

137. Defendants' retaliation against Ms. Laird caused Ms. Laird to suffer

substantial damages.

138. Ms. Laird is entitled to recover her reasonable attorneys' fees and costs under all applicable law, including but not limited to 42 U.S.C. § 12205.

## Count III

### (Unlawful Termination - ASDB)

139. Ms. Laird incorporates by reference the paragraphs set forth above.

140. ASDB retaliated and took adverse actions against Ms. Laird.

141. ASDB discharged Ms. Laird from her employment and/or did not renew her contract for bad cause and in violation of public policy.

142. ASDB discharged Ms. Laird from her employment for retaliatory and/or pretextual reasons unrelated to her job performance.

143. ASDB discharged Ms. Laird from her employment because Ms. Laird filed a complaint with OCR.

144. ASDB discharged Ms. Laird from her employment because Ms. Laird advocated on behalf of the students and families with whom she worked, and engaged in other statutorily protected expression to oppose ASDB's discrimination, retaliation, and/or other violations of federal and/or state law.

145. ASDB discharged and retaliated against Ms. Laird in violation of 29 U.S.C. § 794, 42 U.S.C. § 12131 *et seq.*, 42 U.S.C. § 2000e(b), and/or 28 C.F.R. § 35.134.

146. ASDB's retaliation against and unlawful termination of Ms. Laird caused her to suffer substantial damages.

147. Ms. Laird is entitled to recover her reasonable attorneys' fees and costs under all applicable law, including but not limited to 42 U.S.C. § 1988(b), 42 U.S.C. § 2000e(b), and A.R.S. §§ 12-341 and 12-341.01.

## Count IV

### (Defamation – Reichman)

148. Ms. Laird incorporates by reference the paragraphs set forth above.

149. Reichman made, said, or wrote one or more defamatory statements about

Ms. Laird, including but not limited to statements that Ms. Laird committed one or more crimes and/or was unfit for the proper conduct of her profession.

150. The defamatory statements that Reichman made about Ms. Laird were false.

151. Reichman made, said, wrote, and/or published the defamatory statements about Ms. Laird to one or more third parties, including but not limited to the Phoenix Police Department, Arizona Department of Education, AzEIP, and/or other third parties.

152. Reichman knew the defamatory statements about Ms. Laird were false.

153. Reichman made defamatory statements about Ms. Laird in bad faith.

154. Specifically, Reichman stated that Ms. Laird fraudulently and criminally hacked into the ASDB cloud data system from her personal laptop, accessed unauthorized student and ASDB files, edited teacher documents related to student files, and accessed service-unit related documents related to ASDB employees.

155. On information and belief, Reichman made these false statements outside of ASDB to third parties, including but not limited to, members present at AzEIP ICC meetings in January and February 2020, Jenee Sisnroy, Alicia Amundson, and Sonia Samaniego.

156. Reichman suggested that ASDB was not responsible for the alleged disclosure of any information from the ASDB system, and that Ms. Laird was at fault for the data breach.

157. Reichman acted in reckless disregard of whether the defamatory statements she made about Ms. Laird were false.

158. Reichman either conducted no investigation or an inadequate investigation to determine whether the defamatory statements she made about Ms. Laird were false.

159. Reichman intentionally ignored the facts that Ms. Laird presented to her that demonstrated the defamatory statements were false in order to protect Reichman and ASDB's own liability for noncompliance with state documentation requirements and federal law.

160. Reichman acted negligently in failing to determine the truth of the defamatory



statements that she made about Ms. Laird.

161. Reichman refused to retract or withdraw the defamatory statements that she made about Ms. Laird.

162. The defamatory statements that Reichman made about Ms. Laird caused her to suffer substantial damages.

163. Reichman's conduct was guided by an evil mind.

164. Reichman intended to cause Ms. Laird injury.

165. Reichman were motivated by spite or ill will.

166. Reichman acted to serve her own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of others, including Ms. Laird.

167. Reichman consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, including Ms. Laird.

168. Ms. Laird is entitled to recover punitive damages to punish Reichman, and to deter Reichman and others from engaging in similar misconduct in the future.

169. Ms. Laird is entitled to recover her reasonable attorneys' fees and costs under all applicable law, including but not limited to 42 U.S.C. § 1988(b) and A.R.S. §§ 12-341 and 12-341.01.

### Count V
### (False Light Invasion of Privacy – Reichman)

170. Ms. Laird incorporates by reference the paragraphs set forth above.

171. Defendant Reichman made, said, or wrote one or more public statements about Ms. Laird.

172. The statements created a false impression about Ms. Laird.

173. The false impression that Reichman's statements and conduct created about Ms. Laird would be highly offensive to a reasonable person.

174. Reichman knew the statements she made about Ms. Laird were false and/or would create a false impression about Ms. Laird.

175. Reichman made the statements about Ms. Laird in bad faith.

176. Specifically, Reichman stated that Ms. Laird fraudulently and criminally hacked into the ASDB cloud data system from her personal laptop, accessed unauthorized student and ASDB files, edited teacher documents related to student files, and accessed service-unit related documents related to ASDB employees.

177. Reichman suggested that ASDB was not responsible for the alleged disclosure of any information from the ASDB system, and that Ms. Laird was at fault for the data breach. Reichman acted in reckless disregard of whether the statements she made about Ms. Laird were false and/or would create a false impression about Ms. Laird.

178. Reichman conducted no investigation or an inadequate investigation to determine whether the statements she made about Ms. Laird were false and/or would create a false impression about Ms. Laird.

179. Reichman acted negligently in failing to determine whether the statements that she made about Ms. Laird were false and/or would create a false impression about Ms. Laird.

180. Reichman refused to retract or withdraw the statements that she made about Ms. Laird that placed her in a false light.

181. Reichman's statements that placed Ms. Laird in a false light caused Ms. Laird to suffer substantial damages.

182. Reichman's conduct was guided by an evil mind.

183. Reichman intended to cause Ms. Laird injury.

184. Reichman were motivated by spite or ill will.

185. Reichman acted to serve her own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of others, including Ms. Laird.

186. Reichman consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, including Ms. Laird. Indeed, she used this false information as a pretext to remove Ms. Laird from ASDB.



187. Ms. Laird is entitled to recover punitive damages to punish Reichman, and to deter Reichman and others from engaging in similar misconduct in the future.

188. Ms. Laird is entitled to recover her reasonable attorneys' fees and costs under all applicable law, including but not limited to 42 U.S.C. § 1988(b) and A.R.S. §§ 12-341 and 12-341.01.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendants, jointly and severally, as follows:

A.  For actual and consequential damages in an amount to be proven at trial;

B.  For punitive damages, to the extent they are available, in an amount to be proven at trial;

C.  For all costs and reasonable attorneys' fees incurred in the bringing of this action under all applicable law, including but not limited to 42 U.S.C. § 1988(b), 29 U.S.C. § 794, 42 U.S.C. § 12205, A.R.S. §§ 12-341 and 12-341.01; and

D.  For such other and further relief as the Court finds just and proper.

## **Demand for Jury Trial**

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues that are triable to a jury.

DATED this 2nd day of April, 2021.

By  */s/ Aaron T. Martin*
Aaron T. Martin
Martin Law & Mediation PLLC
PO Box 45023
Phoenix, AZ 85064

*Attorneys for Plaintiff Sara Laird*

